## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**BRUCE K. MARVIN**
8266 Terrace Drive
El Cerrito, California 94530,

|   | |
|---|---|

**CASE NO.:**

**JUDGE:**

              **Plaintiff,**

**MAGISTRATE JUDGE:**

**vs.**

**AQUIFER SOLUTIONS, INC.**
c/o Registered Agent – Karen B. Clayton
29025 A Upper Bear Creek Road
Evergreen, Colorado 80439,

**JURY TRIAL DEMANDED**

**and**

**COMPLAINT FOR MONEY
DAMAGES AND DECLARATORY
JUDGMENT**

**KAREN B. CLAYTON**
28599 Buchanan Drive
Evergreen, Colorado 80439,

**and**

**WILSON S. CLAYTON**
28599 Buchanan Drive
Evergreen, Colorado 80439,

              **Defendants.**

Plaintiff, Bruce K. Marvin, for his Complaint for Money Damages and Declaratory Judgment against Defendants, Aquifer Solutions, Inc., Karen B. Clayton, and Wilson Clayton (collectively, "Defendants"), avers and alleges as follows:

### PARTIES

1.      Plaintiff, Bruce K. Marvin ("Marvin" or the "Purchaser"), is an individual who resides at the address set forth in the caption above.

2.      Defendant, Aquifer Solutions, Inc. ("Aquifer" or the "Corporation"), is a corporation duly organized, validly existing, and in good standing under the laws of the State of

Colorado, with its principal place of business at 29025 A Upper Bear Creek Road, Evergreen, Colorado 80439.

3.  Defendant, Karen B. Clayton, is an individual who resides at the address set forth in the caption above.  At all pertinent times, Mrs. Clayton has been the President and an owner of Aquifer.

4.  Defendant, Wilson S. Clayton, is an individual who resides at the address set forth in the caption above.  At all pertinent times, Mr. Clayton has been the Vice President and an owner of Aquifer.

## JURISDICTION

5.  This is a civil action for breach of contract and declaratory judgment.

6.  This Court has subject-matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332.  This Court has the authority to render a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, in that, as set forth more fully herein, this case presents a matter of actual, justiciable controversy between Marvin and Defendants, and Marvin and Defendants each have a substantial, present interest in the relief sought in this Complaint.

7.  This Court has jurisdiction over Defendants because they reside in Colorado and the claims for relief asserted herein arise from Defendants' transaction of business and other acts in Colorado.

8.  Venue is proper in this judicial district under 28 U.S.C. § 1391 and because it is the judicial district in which Defendants reside and because a substantial part of the events giving rise to Marvin's claims have occurred in this district.

## FACTS COMMON TO ALL CLAIMS

9.  On or about August 1, 2005, Marvin and Aquifer entered into a Stock Purchase Agreement (the "Agreement"), whereby Marvin purchased 3,157 shares of stock in Aquifer.  A

true and accurate copy of the Agreement is attached as **Exhibit A**.   The purchased stock represented approximately 24% of the outstanding capital stock of Aquifer (3,157 out of 13,157).

10.     As of August 1, 2005, Aquifer had a book value of $241,073.39.  The book value of Aquifer was determined by subtracting its corporate liabilities on August 1, 2005, from the corporate assets on August 1, 2005.

11.     Marvin purchased his shares of Aquifer stock for $57,845.00, or approximately 24% of the book value of Aquifer as of August 1, 2005.

12.     On or about June 24, 2009, Marvin voluntarily resigned as Vice President and Operations Manager.  Marvin's resignation triggered Section 4 of the Agreement.  Section 4 of the Agreement defines the manner in which the transfer of Aquifer stock is to occur upon the voluntarily termination of Marvin. See Ex. A ¶ 6b.

13.     With respect to the valuation of the shares of stock, paragraphs 6c and d of the Agreement state, respectively:

> Valuation of Stock.    The redemption price of each share of the capital stock of the Corporation owned by [Marvin] shall be its pro rata share of the fair value of the Corporation to be transferred hereunder as determined in accordance with the mechanism stated on Schedule A attached hereto and made a part hereof.

> Agreement Fixed Full Value. It is understood and agreed between the parties hereto that the redemption or redemption price determined in accordance with paragraph 6c of this Agreement is the full agreed value of each share of the capital stock of the Corporation subject to this Agreement; that except as otherwise provided in this Agreement such value shall in no manner be altered; and that all assets, both tangible and intangible, as well as all liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the assets of the Corporation have been considered in determining said value.

14.     Accordingly, Schedule A provides the mechanism for determining the value of Aquifer stock.  Schedule A states, in pertinent part:

The redemption of each share of the Stock of the Corporation to be redeemed hereunder shall be its pro rata share of the fair value of the Corporation as of the date of an act requiring a redemption hereunder as determined in accordance with the price fixed by the Board of Directors of the Corporation from time to time as hereafter provided. The Board of Directors of the Corporation has determined that the value of the Corporation is $241,073.39 and shall remain that amount until a new value is established by the Board of Directors.

15.     Marvin's voluntary resignation on or about June 24, 2009, constitutes "an act requiring a redemption" under Schedule A.

16.     Between August 1, 2005, and June 24, 2009, the Board of Directors never adjusted the value of Aquifer. Schedule A provides for the manner of calculating the value of the Corporation under such circumstances. It describes the value of the Corporation as equaling the value of the corporate assets minus the value of the corporate liabilities as of the redemption date:

In the event a redemption is required hereunder and where the Board of Directors has not adjusted such value within fifteen (15) months of the date of an act precipitating a redemption hereunder, and if the parties cannot otherwise reach agreement as to the value, the value of the Corporation shall be determined as follows:

1.     Book Value of the Corporation as determined by Accrual Method of Accounting.

2.     The amount computed in paragraph 1 above shall represent the value of all of the outstanding stock of the Corporation with respect to which the Purchaser whose shares are being redeemed shall be allocated his pro rata share . . . .

3     The above described value shall not be increased or otherwise affected by any life or disability buy-out insurance proceeds received by the Corporation or by the Purchaser upon the life of the deceased Purchaser or with respect to a Purchaser's disability.

4.     The above-described value shall not be affected by the Corporation's profits or losses for the year in which an act occurs precipitating redemption hereunder.

> 5.   The above described value should not be affected nor adjusted for any discounts or premiums for such items including, without limitation, minority discounts, lack of control, premiums for controlling interest or lack of marketability. . . .

17.     To avoid the time and expense of calculating the book value of Aquifer as of June 24, 2009, Marvin offered to base his redemption value on the May 31, 2009 book value. The book value of Aquifer as of May 31, 2009, as set forth on the Aquifer Balance Sheet, was $2,521,910.00. See **Exhibit B**. This book value is derived from the corporate assets of Aquifer as of May 31, 2009, minus the corporate liabilities of Aquifer as of May 31, 2009, in exactly the same manner that the book value of Aquifer's corporate assets were valued for the purpose of establishing Marvin's buy-in price in August 2005.

18.     Marvin's pro rata share of the book value of Aquifer as of May 31, 2009, was $605,128.06, or approximately 24% of $2,521,910.00.

19.     Upon information and belief, the book value of Aquifer as of June 24, 2009, is higher than its book value as of May 31, 2009. Consequently, the book value of Marvin's shares in Aquifer as of June 24, 2009, is even higher than its book value as of May 31, 2009.

20.     Defendants rejected Marvin's offer described in paragraphs 17 and 18.

21.     On or about August 17, 2009, and without any basis under the Agreement, Defendants offered to pay Marvin his pro rata share of Aquifer stock based on the book value of Aquifer as of December 31, 2008, or $800,040.00. See Ex. B. Based on that valuation, Defendants offered to pay Marvin $191,968.25 for his pro rata share of Aquifer stock.

22.     Marvin rejected Defendants' offer described in the preceding paragraph.

### FIRST CLAIM
**(Breach of Contract)**

23.     Marvin incorporates the allegations set forth in paragraphs 1 through 22 as if fully restated herein.

5

24.     Defendants are in breach of the Agreement by failing to pay Marvin his pro rata share of Aquifer stock based on the provisions set forth under Section 4 and Schedule A of the Agreement.

25.     Marvin has performed all of his duties and obligations under the Agreement.

26.     As a direct and proximate result of Defendants' breach of the Agreement, Marvin has been damaged in an amount to be proven at trial, but in excess of $75,000.

## SECOND CLAIM
### (Declaratory Judgment)

27.     Marvin incorporates the allegations set forth in paragraphs 1 through 26 as if fully restated herein.

28.     Marvin requests that this Honorable Court issue a declaratory judgment finding and decreeing that the value of Aquifer should be calculated pursuant to Schedule A of the Agreement, and determined to be the total amount of assets as of June 24, 2009, minus the total amount of liabilities as of June 24, 2009.

**WHEREFORE**, Marvin prays for judgment as follows:

(1) As to the First Claim, compensatory damages in an amount to be determined at trial, but in excess of $75,000, interest, attorneys' fees, and costs.

(2) As to the Second Claim, a declaratory judgment finding and decreeing that the value of Aquifer should be calculated pursuant to Schedule A of the Agreement, and determined to be the total amount of assets as of June 24, 2009, minus the total amount of liabilities as of June 24, 2009.

(3) For all further relief Marvin is entitled to at law or at equity.

Respectfully submitted,


_____
Judith D. Levine (CO Bar # 6400)
Roetzel & Andress, LPA
155 East Broad Street, 12th
Columbus, OH 43215
Telephone: 614.463.9770
Facsimile: 614.463.9792
E-mail: jlevine@ralaw.com

Attorney for Plaintiff Bruce K. Marvin

## JURY DEMAND

Plaintiff hereby demands a trial by jury as permitted by law


_____
Judith D. Levine

## STOCK PURCHASE AGREEMENT

This stock purchase agreement is made August 1, 2005, between Aquifer Solutions, Inc., of 3081 Bergen Peak Drive, Evergreen, CO (the "Corporation"), and Bruce Marvin, of 7500 Potrero Ave, El Cerrito, CA, (the "Purchaser").

## RECITALS

A. The Corporation is the owner and holder of all the authorized but not issued shares of the capital stock of the Corporation.

B. The Purchaser desires to purchase 3157 shares of stock in the Corporation (the "Stock") and Seller desires to sell the Stock, upon the terms and subject to the conditions set forth in this agreement.

In consideration of the matters described above, and of the mutual benefits and obligations set forth in this agreement, the parties agree as follows:

## SECTION ONE. PURCHASE AND SALE

1. Subject to the terms and conditions set forth below, at the closing of the transaction contemplated by this agreement, the Corporation shall sell, convey, transfer, and deliver to Purchaser certificates representing all the Stock, and Purchaser shall purchase from the Corporation all the Stock in consideration of the purchase price set forth in this agreement.

2. The closing of the transactions contemplated by this agreement (the "Closing"), shall be held at 3081 Bergen Peak Drive, Evergreen, CO, on _____, 2005, or such other place, date and time as the parties to this agreement may otherwise agree.

## SECTION TWO. AMOUNT AND PAYMENT OF PURCHASE PRICE

3. Purchase Price. As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this agreement, Purchaser shall pay to the Corporation $57,845.00, such total consideration to be referred to in this agreement as the "Purchase Price."

4. Payment. The Purchase Price shall be paid as follows:

$57,845.00 to be delivered to the Corporation at Closing.

## SECTION THREE. REPRESENTATIONS AND WARRANTIES OF SELLER

Corporation warrants and represents:

5. a. Organization and Standing. Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of

1



EXHIBIT
A

Colorado and has the corporate power and authority to carry on its business as it is now being conducted.

   b.   The Stock represents 3157 shares of 13157 shares of the outstanding capital stock of the Corporation and there are currently no options or the like outstanding that are convertible into any capital stock of the Corporation.

   c.   The Corporation will not issue additional capital stock without the consent of Purchaser.

   d.   The Corporation shall make reasonable efforts, subject to the availability of funds to make a minimum distribution to Purchaser in respect of the Corporation's most recently ended tax year by April first of the following year in an amount at least equal to the amount, determined in the reasonable judgment of the President, which is necessary to satisfy the highest federal, state, and local income taxes payable by the Purchaser in respect of the Corporation's net taxable income for such tax year (the "Required Minimum Distribution"); provided however, the Corporation shall be under no obligation to make any Required Minimum Distribution if such distribution is then prohibited under applicable law or any agreement to which the Corporation is a party.

## SECTION FOUR. STOCK RESTRICTIONS

6.   The Stock is restricted. The following restrictions apply to the Stock:

   a.   <u>Redemption of Stock Upon Death</u>. Upon the death of the Purchaser, the Corporation, out of its surplus, shall redeem from such deceased Purchaser's estate and the estate shall sell all of the capital stock of the Corporation or any interest therein owned by the deceased Purchaser. The purchase price of each share of stock to be acquired by the Corporation shall be its value computed in accordance with the provisions of paragraph 6c of this Agreement and payment shall be made in accordance with paragraph 6e.

   b.   <u>Redemption of Stock Upon Termination of Employment</u>. Upon the termination of employment of the Purchaser, other than as a result of the death of the Purchaser, as provided in paragraph 6a above, whether such termination was voluntary or involuntary, or was with or without cause, or was as the result of the disability of a Purchaser as defined in paragraph 6k below, or upon any transfer of the Purchaser's shares of stock other than as permitted hereunder, by operation of law or otherwise, whether or not pursuant to a Court order, the Corporation, out of its surplus, shall redeem from the Purchaser or his successor, if appropriate, and he or his successor shall sell, all of the capital stock of the Corporation or any interest therein owned by the Purchaser at the date of such act permitting a redemption under this paragraph 6b.

2

Subject to paragraph 6n, the price of each share of stock to be acquired by the Corporation under this paragraph 6b shall be its value computed in accordance with the provisions of paragraph 6c and 6d of this Agreement and payment shall be made in accordance with paragraph 6e.

     c.    <u>Valuation of Stock</u>.  The redemption price of each share of the capital stock of the Corporation owned by the Purchaser shall be its pro rata share of the fair value of the Corporation to be transferred hereunder as determined in accordance with the mechanism stated on Schedule A attached hereto and made a part hereof.

     d.    <u>Agreement Fixed Full Value</u>.  It is understood and agreed between the parties hereto that the redemption or redemption price determined in accordance with paragraph 6c of this Agreement is the full agreed value of each share of the capital stock of the Corporation subject to this Agreement; that except as otherwise provided in this Agreement such value shall in no manner be altered; and that all assets, both tangible and intangible, as well as all liabilities, including mortgages, liens or other encumbrances of any kind whatsoever, if any, of or upon the assets of the Corporation have been considered in determining said value.

     e.    <u>Method of Payment</u>.  The redemption price of the capital stock of the Purchaser whose shares of stock are being redeemed hereunder determined in accordance with paragraph 6 of this Agreement shall be paid in the following manner:

     (i)    There shall first be a reduction or credit to the redemption price of the amount of any indebtedness due and payable to the Corporation by the Purchaser.

     (ii)    Within ninety (90) days after the date, after an event causing the Corporation to redeem the Purchaser's stock an amount equal to twenty five percent (25%) of the balance due shall be paid in cash to the Purchaser, or his successor.  The balance of the redemption price shall be paid by the promissory note of the Corporation.  Such promissory note (the "Note") shall be payable as provided in Schedule A attached.  Notwithstanding anything herein to the contrary, in the event of the death of the Purchaser upon whose life the Corporation owned life insurance, or upon the disability of the Purchaser with respect to whom the Corporation owned disability buy-out insurance, the amount of the initial down payment described above shall be equal to the proceeds of any such life insurance or disability insurance policies, but not to exceed the total amount to be paid as described in paragraph 6c above.  The foregoing down payment requirement shall apply whether or not the purchasing party owned said life or disability insurance.  The balance of any such redemption price shall be paid as provided above.

     (iii)    The Corporation shall have the right to prepay any portion or all of the balance of the promissory note, with interest computed to the date of

3

prepayment, without penalty. The promissory note shall call for costs of collection, including reasonable attorneys' fees in the event of default and shall call for acceleration and penalty interest of five percentage points higher than the normal interest rate stated in the note in the event of late payment or default.

(iv)   If at any time the Corporation is required to make payment of all or any portion of the redemption price for stock being redeemed hereunder, its surplus is insufficient for such purpose, then (1) the entire available surplus shall be used to redeem part of the stock of the Purchaser, and (2) the Corporation shall promptly take all required action to reduce the capital stock of the Corporation to the extent necessary for the payment due on the redeemed stock.

(v)   All promissory notes issued by the Corporation shall be secured by a pledge of the shares of stock being redeemed to be held pursuant to a pledge agreement by a party agreed upon by the Purchaser and the Corporation.

f.   Transfer of Shares.   Upon receipt of the redemption price in cash and promissory notes, as provided above, the Purchaser shall deliver the shares of stock to the third party agent (the "Agent") mutually acceptable to the Purchaser and the Company. The Agent will hold the Stock in pledge until full payment of the purchase price has been made. Purchaser (as the seller in that transaction) will have a security interest in the Stock sold as provided in this Agreement and in the Uniform Commercial Code of the State of Colorado. On payment of the final installment of the purchase price, the Agent will deliver back any evidence of ownership of the Stock to the Corporation, or to the Purchaser (as seller in that transaction), as the case may be, and will then be relieved of all further duties under this provision. The purchased Shares may be deemed retired by the Corporation. No distributions, will be paid on Stock so purchased by the Company and such Stock will be treated by the Corporation as being unissued so long as they are held in pledge. In the event of any default by the Corporation, Purchaser (as seller in this transaction) will have all rights of a secured party under the Uniform Commercial Code as then adopted in the State of Colorado, and may direct the Agent to return to Purchaser (as seller in this transaction) all of the Stock or sell all of the Stock held by the Agent, subject to the restrictions on Stock contained in this Agreement, for the benefit of the Purchaser (as seller in this transaction) in accordance with applicable law. The remedy of sale is not exclusive, and the Seller may resort to any other legal or equitable remedy available.

g.   Restriction on Transfer of Stock.   Except as is otherwise expressly permitted hereunder, the Purchaser shall not sell, assign, pledge, or otherwise transfer or encumber, in any manner or by any means whatsoever, any interest in all or any

4

part of his capital stock of the Corporation (i) without the unanimous prior written consent of the other shareholders owning stock in the Corporation hereto first obtained, or (ii) without having first offered it to the other parties hereto in accordance with the terms and conditions of this Agreement as provided in paragraph 6h; provided, however, that if the consent required by this paragraph is granted, it shall, in no manner, relieve the Purchaser of any of his obligations under this Agreement, and the transferee shall accept such stock subject to all restrictions, terms and conditions contained in this Agreement as if he were a party hereto. In addition, prior to any such transfer becoming effective, the transferee shall execute a copy of this Agreement and become a party hereto.

      h.    <u>Method of Selling Stock</u>. In the event the Purchaser shall desire to sell any portion or all of his capital stock in the Corporation, and shall not have received the prior written consent of the other parties to this Agreement as above provided, they may sell the same only after offering it to the Corporation in the following manner:

      (i)    The Purchaser upon his desiring to sell all or part of his stock shall serve notice upon the Corporation by certified mail, return receipt requested, indicating that he has a bona fide offer for the sale of all or a portion of his stock containing the number of shares to be sold, the name and address of the person desiring to purchase same and the sales price and terms of the payment of such sale; said notice shall also contain an offer to sell such stock upon the terms and conditions as set forth in the aforesaid bona fide offer of sale, provided that the price be paid by the Corporation in the event it shall exercise its option to purchase as set forth in the paragraph 6h shall be the lesser of (A) the value as determined by the provisions of paragraph 6c of this Agreement or (B) the price set forth in the bona fide offer.

      (ii)    For a period of thirty (30) days after the mailing of such notice, the Corporation shall have the option to redeem the stock so offered in amounts not to exceed the redemption price as determined in Schedule A attached hereto. The exercise of any such option shall be in writing and delivered to the party desiring to sell his stock.

      (iii)    In the event that the Corporation shall fail to exercise the option to redeem, as provided herein, the Purchaser shall be free to dispose of the shares of stock so offered to the person named in the aforesaid bona fide offer of purchase at the price and upon the terms and conditions set forth in his offer; provided, however, that such disposition must be made within ninety (90) days following the termination of the Corporation's option, and the restrictions provided herein shall continue to apply to any purchaser who shall agree in writing to be bound thereby.

5

(iv)   The manner of payment by the Corporation shall be the same as set forth in paragraph 6e.

i.   Endorsement of Stock Certificates.   Upon the execution of this Agreement, the parties hereto shall cause the certificates of the Stock to be endorsed as follows:

"NOTICE IS HEREBY GIVEN that the transfer or other disposition of the shares of stock represented by this certificate is subject to Transfer Restrictions contained in a Stock Purchase Agreement, a copy of which is on file in the office of the Secretary of the Corporation."

The parties hereto agree that all stock of the Corporation to be issued hereafter shall be subject to this Agreement and shall have endorsed thereon the appropriate notice contained in this paragraph.

j.   Employment Obligation.   Nothing in this Agreement shall be construed as imposing upon the Corporation any obligation to employ or continue to employ Purchaser; and the right of the Corporation to terminate the employment of Purchaser or any service agreement with Purchaser shall not be affected or diminished by reason of the fact that he owns stock therein.

k.   Disability.   In the event the Purchasers becomes totally disabled, as determined by the disability insurance carrier providing insurance on the Purchaser, or if no such policy is then in effect, then by the majority opinion of three doctors, one to be appointed by the Purchaser, one by the Corporation and the third to be appointed by the two doctors so selected, so as not to be able to continue to engage in the business of the Corporation in the same capacity and to the same extent as prior to his disability, then the Corporation shall have the option or be required to redeem his entire stock interest in the Corporation under the provisions of this Paragraph 6 for the price determined in paragraph 6c and the terms set forth in paragraph e above.   The determination of the extent of disability shall be made at a point ninety (90) days after its onset and that shall be equivalent to the date of termination of employment otherwise provided for herein for the purpose of determining the proper dates for commencement of the option period described in paragraph 3 above and the payment of any amounts due hereunder.   The redemption price hereunder shall not be reduced by the amounts of wages or other compensation paid by the Corporation to the disabled Purchaser during the period of his disability.

l.   Life and Disability Insurance.   The Corporation may purchase, maintain and continue in force, at its sole cost and expense, life insurance on the life

6

of the Purchaser or disability buy-out insurance in an amount to be determined by the parties. The Corporation shall be the absolute owner and the beneficiary of each policy of insurance issued in accordance with the terms of this Agreement, shall pay all premiums thereon and, subject to the provisions hereof, shall have the exclusive right to exercise every privilege or right set forth in such policy or policies. All policies of life or disability buy-out insurance purchased and maintained for purposes of this Agreement shall be listed on Schedule B, attached hereto and incorporated herein by this reference and shall be held by the Escrow Agent subject to the Escrow Agreement attached as Schedule D.

m.      Notwithstanding anything to the contrary set forth in this Agreement, neither Wilson nor Karen Clayton (collectively the "Claytons") may transfer a majority of their interests in the Corporation to any prospective purchaser ("Prospective Purchaser") (other than to each other) unless the Prospective Purchaser agrees to purchase the same percentage of the stock of the Corporation owned by Purchaser as the Prospective Purchaser is purchasing the Claytons' stock and any such purchase of Purchaser's stock must be at the same price per share, and on the same terms and conditions as he is purchasing the Clayton's stock in the Corporation (the "Tag Along Option"). Any such purchase offer (the "Purchase Offer") shall be delivered by hand or by first class certified or overnight mail, postage pre-paid, or by telecopier, to Purchaser and shall set forth the dollar amount each selling stockholder (including Purchaser) is to receive upon the transfer of each stockholder's shares of stock. The failure of Purchaser to respond within 10 days after the Date of the Purchase Offer shall be deemed a rejection by Purchaser of such Purchase Offer.

n.      Notwithstanding anything to the contrary contained in this Agreement, in the event (i) a Purchase Offer is received from a Buyer, as set forth in paragraph 6m above, within six (6) months of the termination of the Purchaser's employment with the Corporation other than voluntarily by Purchaser or for "Cause" (as defined in paragraph 7c below) by the Corporation, and (ii) any sale by the Corporation or the Claytons is consummated with the Buyer or its affiliates within nine (9) months of such Purchase Offer, the original price paid by the Corporation for Purchaser's Stock upon the termination of Purchaser's employment shall be adjusted dollar for dollar to reflect any increase in the purchase price paid to Purchaser to which Purchaser would have been entitled had Purchaser remained an employee of the Corporation at the time of the Purchase Offer and elected to Tag Along with the Claytons.

In the case of the death of the Purchaser, the parties agree that the death proceeds of the life or disability buyout insurance polices in effect on the date of the death of the Purchaser, which were issued for the purposes of and in accordance with the terms of this Agreement, shall be applied, to the extent needed, to the purchase price of the deceased or disabled Purchaser's shares as provided in this paragraph 6.

7

.

**SECTION FIVE. COVENANT NOT TO COMPETE**

7.  As additional consideration for the entering into of this Agreement, Purchaser agrees not to compete with the business of the Corporation, as provided below, and not to utilize, nor divulge, certain proprietary information of the Corporation, as provided below. The parties agree and acknowledge that the Purchaser, as a key management level employee and Shareholder, has had access to certain confidential and proprietary information relating to the business of the Corporation and has a special intimate knowledge of the affairs of clients or customers (hereafter collectively "clients") of the Corporation, including, without limitation, client lists and other information relating to the identity of clients of the Corporation, persons employed by such clients, and the future needs of such clients. Purchaser acknowledges that such information and such knowledge comprise an important valuable asset of the Corporation that any removal, disclosure or unauthorized use of such information or knowledge by Purchaser would do material irreparable damage to the Corporation. Purchaser agrees and acknowledges that it would be difficult to determine if Purchaser was utilizing such information and knowledge in a manner contrary to the provisions of this Agreement. As a result of the foregoing, Purchaser agrees as follows:

a.  Purchaser covenants and agrees that he will not, either during the term of his employment by the Corporation or any time thereafter, directly or indirectly, use or disclose to any person, business, firm, or corporation any information or knowledge of the business and affairs of the Corporation. Proprietary Information shall not include any (i) information which, after disclosure by the Corporation to Purchaser, becomes part of the public domain by publication or otherwise through no fault of Purchaser, (ii) information which Purchaser can show was in his possession at the time of disclosure by the Corporation to Purchaser and which was not acquired directly or indirectly from the Corporation; (iii) information which is rightfully received by the Purchaser after termination of employment with the Corporation from a third party who did not acquire such information directly or indirectly from the Corporation. Proprietary Information shall include all technology development, and application data, testing results, design tools and algorithms. The contents of paper and electronic files of the Corporation shall remain Proprietary Information of the Corporation and shall not be taken or transferred from the exclusive use of the Corporation and its employees.

b.  Except in connection with Purchaser's regular duties as an employee during the term of his employment, Purchaser will not, during the term of his employment by the Corporation or at any time thereafter, directly or indirectly, use or disclose any information or knowledge relating to the clients of the Corporation or their identity, which he may have acquired in the course of, or incidental thereto, his employment by the Corporation, whether for his own benefit or to the detriment or

8

probable detriment of the Corporation. If the Purchaser's employment with the Corporation was not terminated voluntarily by the Purchaser or for "Cause" (as defined in paragraph 7c) by the Corporation, then this restriction shall only remain in place for 1 year after his separation from the Corporation.

    c.    Purchaser will not, during the term of his employment by the Corporation and for two (2) years thereafter (unless Purchaser's employment was not terminated voluntarily by Purchaser or for "Cause" (as defined in this paragraph 7c) by the Corporation in which case the period after his separation shall be one (1) year), directly or indirectly, as an employee, agent, principal, shareholder, partner, joint venturer, member or manager of a limited liability company, or in any other manner, attempt to solicit, do business with, or otherwise contact any client or customer of the Corporation (hereafter, collectively "Client") who is a client at the date of termination of employment or who was an active prospect of the Corporation or who was a client within one (1) year prior thereto for the purpose of competing with the business of the Corporation. "Cause" shall mean (i) conviction of a felony, or (ii) if it is found by a reasonable determination by the Corporation Purchaser is engaging in willful or gross neglect in connection with his duties with the Corporation, or (iii) fraud, misappropriation or embezzlement, or (iv) a failure to perform the reasonable and customary duties of his position with the Corporation, provided such failure is not cured within a reasonable period following written notice from the Corporation of any such failure, but in no case shall such period following notice be less than 90 days.

    d.    Purchaser shall not, during the term of his employment by the Corporation and for two (2) years thereafter either directly or indirectly, as an employee, agent, principal, shareholder, partner, joint venturer, member or manager of a limited liability company, or in any other manner solicit to employ, hire, or contract for work any employee of the Corporation.

Purchaser acknowledges that the restrictions set forth herein are reasonable and will not unduly interfere with his ability to obtain employment in the field of his interests, experience and training upon termination of his employment with the Corporation. Purchaser understands that the Corporation's business is presently limited and specialized to the field of environmental assessment and engineering and soil and ground water remediation and is anticipated to be so in the future.

The parties agree that any failure on the part of Purchaser to comply with the provisions of this Paragraph 7 shall be deemed willful and shall give rise to an action for damages, punitive or otherwise, the cost of bringing such action, whether or not a legal proceeding is instituted, and reasonable attorney's fees. Due to the severe detriment that could be suffered by the Corporation should Purchaser be in breach under any of the provisions of this paragraph and due to the difficulty of measuring damages, the parties also agree that the Corporation shall be entitled to injunctive relief in the event of any such breach.

.

The covenants contained in this Paragraph 7 shall be construed as independent of each other and shall survive the termination of employment of Purchaser and in the event any such provision shall be deemed invalid or enforceable, such provision shall not invalidate or have any effect on any other provision of this Paragraph.

## SECTION SIX.  REPRESENTATION

8.    The parties acknowledge that Richard Toussaint of Toussaint, Nemer & Coaty, P.C. prepared this Agreement; Mr. Toussaint represents the Corporation and that a conflict of interest exists between the individual Purchasers and the Corporation.    The parties acknowledge that they have been advised by Mr. Toussaint to seek the advice of independent counsel and that they have had an opportunity to do so. The parties represent and acknowledge they have received no representation or advise concerning the tax consequences of this Agreement and they have been advised to seek independent tax counsel in connection therewith and have had the opportunity to do so.

## SECTION SEVEN.  GENERAL PROVISIONS

9.    <u>Applicable Law.</u> This Agreement, its terms and conditions shall be construed and interpreted pursuant to the laws of the State of Colorado.

10.    <u>Benefit.</u>  This Agreement shall be binding upon the parties hereto, their heirs, legal representatives, successors and assigns.  The Purchaser in furtherance thereof shall execute a Will directing his personal representative to perform this Agreement and to execute all documents necessary to effectuate the purpose of this Agreement, but the failure to execute such Will shall not affect the rights of the Purchaser or the obligations of any estate, as provided in this Agreement.

11.    <u>Notices.</u>  Any and all notices, designations, consents, offers, acceptances or other communications provided for herein shall be given in writing by certified mail, or registered mail which shall be addressed in the case of the Purchaser, his personal representative to his address last appearing on the stock records of the Corporation or such other address as may be designated by him.

12.    <u>Severability.</u>  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

13.    <u>Modification.</u>  No change or modification of this Agreement shall be valid unless the same shall be in writing signed by all the parties who are then bound by the terms hereof.

10

14.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, the sum of which shall constitute one original Agreement.

AQUIFER SOLUTIONS, INC.

_____
Karen Clayton, President


ATTEST:

_____
Wilson Clayton, Secretary


_____
Karen Clayton, individually for the
purpose of agreeing to paragraph 6m
and n

_____
Wilson Clayton, individually for the
for the purpose of agreeing to paragraph 6m
and n


PURCHASER:

_____
Bruce Marvin


11

AQUIFER SOLUTIONS, INC

STOCK BUY- SELL AGREEMENT

SCHEDULE A

The redemption price of each share of the Stock of the Corporation to be redeemed hereunder shall be its pro rata share of the fair value of the Corporation as of the date of an act requiring a redemption hereunder as determined in accordance with the price fixed by the Board of Directors of the Corporation from time to time as hereafter provided. The Board of Directors of the Corporation has determined that the value of the Corporation is $241,073.39 and shall remain that amount until a new value is established by the Board of Directors. The Board of Directors of the Corporation shall, at least annually set the fair value of all of the Corporation's stock. The agreed upon value shall be stated on Schedule C which shall be updated from time to time.

In the event a redemption is required hereunder and where the Board of Directors has not adjusted such value within fifteen (15) months of the date of an act precipitating a redemption hereunder, and if the parties cannot otherwise reach agreement as to the value, the value of the Corporation shall be determined as follows:

1.      Book Value of the Corporation as determined by Accrual Method of Accounting.

2.      The amount computed in paragraph 1 above shall represent the value of all of the outstanding stock of the Corporation with respect to which the Purchaser whose shares are being redeemed shall be allocated his pro rata share and shall apply in the event of a redemption resulting from the death of a Purchaser. In the event of a redemption resulting from other than the death of a Purchaser, the redemption price shall be allocated 95.0% to the redemption of the shares in question and 5.0% to the covenant not to compete.

3.      The above described value shall not be increased or otherwise affected by any life or disability buy-out insurance proceeds received by the Corporation or by Purchaser upon the life of the deceased Purchaser or with respect to a Purchaser's disability.

4.      The above-described value shall not be affected by the Corporation's profits or losses for the year in which an act occurs precipitating redemption hereunder.

5.      The above described value should not be affected nor adjusted for any discounts or premiums for such items including, without limitation, minority discounts, lack of control, premiums for controlling interest or lack of marketability.

6.      The Note shall as required for redemption shall be payable in twenty four (24) equal monthly installments, unless sooner paid, of principal and interest, with interest at the prime rate then charged by the U S Bancorp, N.A. to its preferred customers, with the first such payment being payable on the first day of the first month following the month in which the twenty five (25%) percent payment described in Section 6. is made and continuing on the first day of each succeeding month until paid in full. The interest rate shall be adjusted to such prime rate on the first day of each calendar year that the promissory note remains unpaid.

AQUIFER SOLUTIONS, INC

STOCK BUY - SELL AGREEMENT

SCHEDULE B

LIFE INSURANCE

| Insured | Insurer | Policy # | Face Value of Policy |
|---------|---------|----------|----------------------|
| | | | |

STOCK BUY - SELL AGREEMENT

SCHEDULE C

AGREED UPON VALUE OF THE CORPORATION

Date                    Agreed Upon Value                    Signatures of Purchasers

**Aquifer Solutions, Inc.**
**Balance Sheet**
**May 31, 2009**

| Current Assets | | 2008 | | 2009 |
|---|---|---|---|---|
| Cash | $ | 199,379 | $ | 470,701 |
| Restricted Cash - ILOC | | 163,906 | | 163,906 |
| Accounts receivable | | 533,497 | | 2,056,457 |
| Cost/Profit in excess of billings | | 56,350 | | 0 |
| Prepaid Expenses | | 8,316 | | 27,978 |
| Deposits | | 0 | | 1,900 |
| **Total Current Assets** | $ | **961,447** | $ | **2,720,942** |
| | | | | |
| **Fixed Assets** | | | | |
| Vehicles | $ | 62,699 | $ | 62,699 |
| Leasehold Improvements | | 7,990 | | 7,990 |
| Furniture and office equipment | | 19,005 | | 19,005 |
| Computer and software | | 84,678 | | 86,598 |
| Environmental equipment | | 33,055 | | 33,055 |
| | | **207,427** | | **209,346** |
| Less A/D & Amortization | | -154,687 | | -154,687 |
| | $ | **52,740** | $ | **54,659** |
| | | | | |
| **Total Assets** | $ | **1,014,187** | $ | **2,775,602** |
| | | | | |
| | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | $ | 79,128 | $ | 156,072 |
| Accrued Direct Expenses | $ | - | $ | 26,771 |
| Credit Cards Payable | | 8,420 | $ | (1,001) |
| Billings in excess of costs | | 52,456 | | 0 |
| Payroll Taxes Payable | | 3,759 | | 0 |
| Salaries Payable | | 41,149 | | 45,369 |
| Accrued bonuses | | 0 | | 0 |
| Accrued paid time off | | 26,844 | | 26,481 |
| Retirement plan payable | | 2,392 | | 0 |
| **Total Current Liabilities** | $ | **214,149** | $ | **253,692** |
| | | | | |
| **Long term Liabilities** | $ | - | $ | - |
| | | | | |
| **Stockholders Equity** | | | | |
| Common Stock | | 58,845 | | 58,845 |
| Retained Earnings | | 741,194 | | 2,463,065 |
| **Total Stockholders Equity** | | **800,039** | | **2,521,910** |
| | | | | |
| **Total Liabilities and Stockholders Equity** | $ | **1,014,187** | $ | **2,775,602** |



EXHIBIT

tabbies

_B_